[Cite as *In re K.A.*, 2022-Ohio-4267.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: K.A., A.A.1, A.A.2, A.A.3, W.A., K.A1, A.A.4, A.A.5, A.A.6, K.R.2, and K.R.3 | : | APPEAL NOS. C-220352 |
| | | C-220385 |
| | : | TRIAL NO. F19-174X |
| | : | |
| | | *O P I N I O N.* |
| | : | |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: November 30, 2022

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Michelle Browning*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Alana Van Gundy,* for Appellant Father,

*Jon R. Sinclair,* for Appellant Mother,

*Kathleen A. Kenney*, Attorney for Guardian Ad Litem for children.

**BOCK, Judge.**

{¶1}   Appellants, Father and Mother, appeal the juvenile court's judgment terminating their parental rights to their children, K.A., A.A.1, A.A.2, A.A.3, W.A., K.A.1, A.A.4, A.A.5, A.A.6, K.R.2, and K.R.3. We affirm the juvenile court's judgment.

<u>RELEVANT FACTS AND PROCEDURAL HISTORY</u>

{¶2}   In November 2019, the Hamilton County Department of Job and Family Services ("HCJFS") filed a complaint with the Hamilton County Juvenile Court, alleging that (1) Mother had been released from the Ohio Reformatory for Women after serving a three-year prison sentence for robbery and attempted robbery, (2) Father cared for the children with the help of relatives while Mother was incarcerated, but left them in Mother's care upon her release, and (3) Mother and her children had been homeless since she was evicted from her home in October 2019. Mother informed HCJFS that she had nowhere for her and her children to stay. The affidavit further alleged that, on another occasion, A.A.3 was left alone at a laundromat while Mother and the other children were at a restaurant.

{¶3}   Mother reported that Father had been violent toward her. HCJFS also noted Mother's history of substance abuse and that she and each child, at that child's birth, tested positive for illegal substances.

{¶4}   While Father is the legal father of all 11 children because they were born during the marriage of Father and Mother, Mother's paramour, K.R., is the alleged father of one or more of the children. K.R. did not seek to establish paternity or engage in case plan services, prompting the court to dismiss any matters involving him.

**Magistrate grants temporary custody of children to HCJFS**

{¶5}   In November 2019, the magistrate granted HCJFS an emergency order for custody of the nine oldest children and granted interim custody the following day.

{¶6}   Mother moved for a shelter care hearing in December 2019, stating that she had obtained suitable housing and requested that the children be remanded to her custody with protective orders. The court denied her motion.

{¶7}   Mother gave birth to K.R.2 in January 2020. She tested positive for marijuana in the hospital. A few days later, the magistrate granted HCJFS emergency and interim custody of K.R.2.

{¶8}   In March 2020, the magistrate adjudicated the children dependent and placed them in HCJFS's temporary custody. The magistrate noted that Mother had completed her diagnostic assessment of functioning ("DAF"). The DAF reported that Mother had diagnoses of post-traumatic stress disorder, generalized anxiety disorder, and stimulant use disorder. It recommended Mother engage in individual counseling, medication management, random drug screens (she admitted in court that she had used methamphetamines since 2019), a domestic violence assessment, and parenting classes.

**Parents struggle to comply with case plan**

{¶9}   The court instituted a plan for reunification. It ordered Mother to (1) continue individual counseling, (2) comply with domestic-violence counseling, parenting education, and random drug screens, (3) regularly visit with the children, and (4) maintain housing and an income. The court ordered Father to (1) maintain sobriety and submit to random drug screens, (2) complete intensive outpatient substance-abuse treatment and after-care recommendations, (3) comply with

transitional case-management services and community psychiatric support treatment, (4) attend the intake appointment at the Family Nurturing Center and regularly visit with the children, (5) comply with parenting education, and (6) maintain stable housing and income.

{¶10} HCJFS and the guardian ad litem ("GAL") reported concerns that Mother and Father were abusing substances, that there had been "multiple instances" of domestic violence witnessed by the children, and that there had been police runs to Mother's home causing Mother to file a temporary protection order ("TPO") against Father, who had been residing with Mother her paramour. The court ordered Father to complete an assessment through Family Access to Integrated Recovery ("FAIR assessment"), submit to drug screens, and participate in individual counseling and parenting classes.

{¶11} By September 2020, Mother had completed parenting education and domestic-violence counseling, was engaged in counseling with positive feedback from her therapist, and regularly visited the children. The magistrate, however, was concerned that Mother continued to reside with K.R., who had only recently begun counseling but had not addressed domestic-violence concerns. The magistrate noted that Mother had not completed drug screens. The court permitted Mother to have unsupervised visits with the older children, but prohibited Father and K.R. from attending. Reunification remained possible if Mother submitted to drug screens and maintained employment. Father was to engage in services through Crossroads church as recommended by FAIR and needed to "engage with the agency and services."

{¶12} But in November 2020, the magistrate terminated Mother's unsupervised visits. That month, Mother gave birth to K.R.3. Both Mother and K.R.3

tested positive for methamphetamines and amphetamines at K.R.3's birth. The GAL also asserted that Mother's paramour had attended one of Mother's unsupervised visits in violation of the court's order. The court's entry stated that the parents "vary" in making progress on their case plan and were not making satisfactory progress at that time.

{¶13} In January 2021, the trial court adjudicated K.R.3 abused and dependent. In March 2021, the magistrate granted HCJFS's motion for interim custody of K.R.3. The parents were not making "satisfactory progress." In addition to her and the baby testing positive for illegal substances when K.R.3 was born, Mother had missed "several drug screens" beginning in October 2020. Mother had been "resistant" toward HCJFS since the denial of her motion for shelter care and would no longer submit to hair follicle screens. Father had not engaged in services.

{¶14} The court ordered Mother to submit to toxicology screens, engage in mental-health and substance-abuse services, and maintain "stable, appropriate housing." Because four of the children expressed to the GAL a desire to remain with Mother, the court appointed an *In re Williams* attorney for those children.

### The goal remained reunification

{¶15} A May 2021 case-plan update stated that reunification was possible as Mother was engaging in services, although her visits had been reduced from four to two hours per week because Mother's visits had been "sporadic" with the youngest children. HCJFS's semiannual report ("SAR") stated ongoing concerns regarding domestic violence, engagement in mental-health services, appropriate housing, and Mother's relapse and failure to attend drug screenings. Father visited the children, but the SAR provided no further information on him.

{¶16} A July 2021 entry stated that the parties stipulated that the children were "doing well in their respective placements." It ordered Mother to maintain stable housing and income, complete intensive outpatient substance-abuse treatment and random drug screens, comply with mental-health treatment, and visit regularly with the children. Father was to complete drug screens and a DAF, follow through with treatment recommendations, and maintain stable housing and income.

### HCJFS moved for permanent custody

{¶17} In September 2021, HCJFS moved to modify temporary custody of the children to permanent custody. The motion stated that the children, other than K.R.3, the youngest, had been in HCJFS's temporary custody for 12 of 22 consecutive months.

{¶18} K.R.3 had only been in HCJFS's custody since January 2021, when she was released from the hospital. But the motion alleged that K.R.3 could not, or should not, be placed with either parent within a reasonable time due to the parents' substance abuse, mental-health issues, and lack of housing.

{¶19} In October 2021, the magistrate found that Mother was engaged in inpatient substance-abuse and mental-health treatment at Talbert House.

{¶20} HCJFS moved to modify temporary custody of the two eldest children to a planned permanent living arrangement ("PPLA").

{¶21} The GAL supported granting permanent custody of the nine youngest children to HCJFS, and a PPLA for the two oldest children. Mother had been unsuccessfully discharged from FAIR, was discharged from Bethany House in August 2021, and was removed from the inpatient substance-abuse and mental-health treatment at Talbert House after only being there for two months. Father had made little progress in his case plan.

**Permanent Custody Hearing**

{¶22} At a March 2022 permanent-custody hearing, Mother, service providers, the GAL, and caseworkers testified, but Father did not testify.

Caseworkers testified about parents' issues

{¶23} A Talbert House transitional-housing case manager testified that Mother had not obtained housing, was discharged from the program for failing to return to the facility to sleep, and had tested positive for alcohol while she was in the program.

{¶24} HCJFS caseworkers testified about the parents' homelessness, substance abuse and domestic violence, the services offered to the parents, and the parents' engagement in services. Mother's substance abuse and mental health remained consistent concerns throughout HCJFS's custody of the children.

{¶25} An HCJFS caseworker testified that Mother had attended two substance-abuse meetings and had completed parenting and domestic-violence classes. Mother visited the children. But she had not participated in drug screens and had informed her case worker that she refused to be screened for drugs. HCJFS stopped referring Mother for urine screens based on that refusal. Failure to participate in a screen constitutes a positive test.

{¶26} According to HCJFS caseworkers, though Mother had stable housing at one point, she was "thrown out" of her house in August 2021 after part of the house had caught on fire. Mother failed to provide information about her housing situation despite knowing HCJFS's policy that parents are required to provide updated housing information.

{¶27} HCJFS caseworkers testified that Father had consistently visited the children, but otherwise did not engage in reunification services. An HCJFS caseworker and the GAL visited Father's home in the summer of 2021. Father told them that he was looking for "stable housing" for himself and the children. Father resided with his brother and an unidentified adult. The HCJFS caseworker and the GAL only sat in the kitchen and did not otherwise inspect the home. The caseworker testified that she had no knowledge of whether Father had independent housing and did not know the status of the business that Father was reported to have launched.

Mother testified

{¶28} Mother testified that she was "staying with a friend" in a three-bedroom home since being discharged from Talbert House. She stated that she did not provide housing information to HCJFS because the caseworker would not respond to her texts. She asserted that she asked to resume drug screens in January 2022.

{¶29} Mother explained that Talbert House had discharged her because she had four jobs, including helping Father start a cleaning business. She stated that she got a hotel room because she could not sleep, and she was "getting into it" with her "bunkie." Mother testified that HCJFS "never really referred [her]" to services except for FAIR and she had not been asked to attend drug screens over the previous six months, but she had submitted to drug screening two or three times while she was in Talbert House and to secure jobs.

{¶30} Mother testified that after her house caught fire and she caught K.R. cheating, she was committed to a psychiatric unit in May 2021 and released the next day. She conceded that there were methamphetamines in her system upon admission but asserted that she had not used drugs since then.

{¶31} Mother conceded that, in May 2021, she stated in open court that she would not submit to drug screens. Mother stated that she did not seek further substance-abuse treatment because she was not using and did not need it.

### The Magistrate's Decision

{¶32} The magistrate committed all 11 children to HCJFS's permanent custody. The magistrate noted that Father regularly visited the children and had a positive bond with them but found that Father had not engaged in services and lacked stable housing. Moreover, the magistrate noted Father's failure to testify.

{¶33} The magistrate determined that Mother had failed to submit to random drug screens, which constituted positive screens. Mother had tested positive for drugs when she gave birth to her two youngest children and when she was hospitalized in a psychiatric ward. The magistrate determined that Mother lacked stable housing.

{¶34} Under R.C. 2151.414(B)(1)(d), the magistrate found that the children, other than K.R.3., had been in HCJFS's temporary custody for 12 or more months of a consecutive 22-month period. And the magistrate determined that the children could not, or should not, be placed with their parents as the parents "failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside the children's home."

{¶35} The magistrate addressed the best-interest factors, as adopted by the court and discussed below.

{¶36} For the oldest two children, the magistrate took the PPLA motion under advisement and continued the decision to a later date. The magistrate later found that a PPLA was in their best interest as they had expressed that they did not want to be committed to HCJFS's permanent custody or adopted.

9

{¶37} Both parents objected to the magistrate's decision. They argued that the magistrate (1) failed to properly determine the factual issues and appropriately apply the law; (2) erred by granting permanent custody to HCJFS; (3) improperly applied the "best interests" factors; and (4) granted HCJFS custody against the manifest weight of the evidence. Father also argued that there was no evidence supporting the magistrate's findings because he had housing and consistently visited the children.

**Juvenile Court overrules objections**

{¶38} The court adopted the magistrate's decision via separate entry.

{¶39} First, the court found that all the children, other than K.R.3, had been in HCJFS's temporary custody for more than 12 months of a consecutive 22-month period. It further found that the children could not be placed with either parent within a reasonable time or should not be placed with the parents, and that following placement with HCJFS, despite reasonable case planning and agency efforts, the parents repeatedly failed to remedy the conditions that caused the children to be placed with HCJFS.

{¶40} Next, the court discussed the best-interest factors.

*R.C. 2151.414(D)(1)(a) Interactions and Interrelationships*

{¶41} The court found that the nine eldest children had positively adjusted to their respective placements and had not resided with either parent for more than two years. The two youngest had resided since birth in the foster home where they had been placed together. Though the parents had been visiting the children, the children's placement history had been unstable "for many years" due to Mother's prior incarceration and Father's inconsistent care for the children in the past. The entry

stated that Father was homeless and was not providing financial support for the children and noted Mother's report that Father physically accosted her in August 2019.

*R.C. 2151.414(D)(1)(b) The Wishes of the Children*

**{¶42}** The GAL agreed with permanent custody. Though some children had stated a desire to return to "a parent's home," they expressed satisfaction with their current placements if they could not be returned to one of their parents.

*R.C. 2151.414(D)(1)(c) Custodial History*

**{¶43}** The court stated, "All children have now lived outside of their parents' care for more than 12 months." Further, the ten oldest children had lived outside of their parents' care for more than two years.

*R.C. 2151.414(D)(1)(d) Child's Need for Legally Secure Permanent Placement*

**{¶44}** The court held that it could not further extend temporary custody to HCJFS and a PPLA was not yet available for the two oldest children. No other relatives expressed interest in assuming legal custody of the children, and the parents could not provide a stable, long-term placement for the children. Therefore, the juvenile court committed all the children to HCJFS's permanent custody.

## ASSIGNMENTS OF ERROR

**{¶45}** Both parents asserted as error that the juvenile court's judgment was supported by insufficient evidence and was contrary to the manifest weight of the evidence. Mother also argued that the court did not determine that K.R.3 was in HCJFS's custody for more than 12 of 22 consecutive months and HCJFS had failed to prove that K.R.3 could not be placed with a parent.

**{¶46}** Parents have a paramount right to the custody of their children. Thus, the juvenile court's determination to grant permanent custody to HCJFS must be

11

supported by "clear and convincing" evidence. *In re W.W.*, 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, ¶ 46. Clear and convincing evidence is sufficient evidence to "produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954). This court will not substitute its judgment for the trial court's when applying a clear-and-convincing standard if ample competent and credible evidence supports the trial court's determination. *In re A.M.*, 1st Dist. Hamilton No. C-190027, 2019-Ohio-2028, ¶ 16.

{¶**47**} A review of the sufficiency of the evidence is different than a review of the weight of the evidence. *In re A.B.*, 1st Dist. Hamilton Nos. C-150307 and C-150310, 2015-Ohio-3247, ¶ 15. To determine whether there was sufficient evidence upon which to terminate parental rights, the court determines whether some evidence exists on each element. It is a test for adequacy and is a question of law. *Id.* at ¶ 15. When conducting a weight-of-the-evidence review in permanent-custody cases, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the juvenile court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. *Id.* at ¶ 16.

{¶**48**} Before terminating parental rights and granting permanent custody to a public child-services agency, a juvenile court must apply the two-pronged test established by R.C. 2151.414(B)(1). The statute requires the court to find, by clear and convincing evidence, that: (1) one of the enumerated factors in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) permanent custody is in the best interest of the child under R.C. 2151.414(D)(1)(a)-(e). R.C. 2151.414(B)(1). The first prong of the permanent-custody

test is satisfied when a child is in the temporary custody of HCJFS for 12 or more months of a consecutive 22-month period, or when the child cannot be placed with a parent within a reasonable time or should not be placed with a parent. R.C. 2151.414(B)(1)(a) and (d).

## Analysis

**{¶49}** Under the first prong, the juvenile court determined that the children, other than K.R.3, had been in HCJFS's custody for at least 12 of 22 consecutive months. R.C. 2151.414(B)(1)(d). The parents do not dispute this finding.

**{¶50}** And HCJFS proved by clear and convincing evidence that the children, including K.R.3, could not be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(B)(1)(a). The parents failed to significantly complete their respective case plans. Neither parent demonstrated that they had independent, stable housing at the time of the permanent-custody hearing. Mother continued to test positive for drugs. The problems that caused the children to be placed in HCJFS's custody were not resolved. The trial court's determinations on the first prong of the test were supported by sufficient evidence and were not contrary to the weight of the evidence.

**{¶51}** Next, the juvenile court considered the best-interest factors under R.C. 2151.414(D). We find that the court's determinations on this prong, too, were supported by sufficient evidence and were not contrary to the manifest weight of the evidence.

**{¶52}** Most of the children had been placed with foster parents for more than two years. K.R.2 and K.R.3 had lived with the same foster family their entire lives. All

11 children were bonded with their respective foster families. The children made positive progress in their respective placements.

**{¶53}** Mother visited inconsistently. Though some of the children wished to live with a parent, they expressed a desire to stay in their current placements if they could not be returned to them. And while Mother was given unsupervised visits and Father visited the children consistently, Mother's unsupervised visits were revoked after she and K.R.3 tested positive for illegal substances at K.R.3's birth.

**{¶54}** The problems that caused the children's removal from the home persisted. Mother continued to have substance abuse issues. Neither parent had stable housing. Although Father now argues that he had stable housing at the time of the hearing as it was the "same home" that he had lived in "for the entire time of the case," he told HCJFS that he was seeking "stable" housing for himself and his children. And Father chose not to dispute testimony involving his lack of housing because he did not testify. Moreover, Father's failure to testify was a choice to not object to testimony regarding his failure to comply with the case plan.

**{¶55}** Mother argued that the juvenile court failed to find that HCJFS made diligent efforts to assist the parents in remedying the issues that led to the removal of the children. But the record is clear that although HCJFS attempted to reunify the children with the parents, the parents simply failed to comply.

**{¶56}** Mother's and Father's assignments of error are overruled.

## CONCLUSION

**{¶57}** The court's judgment granting HCJFS permanent custody of the children was supported by sufficient evidence and was not contrary to the manifest

weight of the evidence. We overrule Father's and Mother's assignments of error and affirm the trial court's judgment.

Judgment affirmed.

**CROUSE, P.J.,** and **WINKLER, J.,** concur.

Please note:

      The court has recorded its entry on the date of the release of this opinion.